IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| M. SHAFI CHAUDRY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. CIV-04-0186-L |
| ) | |
| THE BOEING COMPANY, ) | |
| ) | |
| Defendant. ) | |

## O R D E R

Plaintiff had been employed by defendant, The Boeing Company ("Boeing"), for 23 years when he was terminated during a reduction in force ("RIF"). On February 23, 2004, plaintiff filed this action claiming that Boeing discriminated against him on the basis of his race, color, national origin, religion, and age when it terminated him during the RIF. Plaintiff also alleges his termination was in retaliation for his prior complaints of discriminatory treatment. In addition to his termination claims, plaintiff alleges that Boeing discriminated against him in determining pay increases and promotions. He seeks damages pursuant to 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964, as amended, and the Age Discrimination in Employment Act.

This matter is before the court on Boeing's motion for summary judgment. Summary judgment is appropriate if the pleadings, affidavits, and depositions "show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Any doubt as to the

existence of a genuine issue of material fact must be resolved against the party seeking summary judgment. In addition, the inferences drawn from the facts presented must be construed in the light most favorable to the nonmoving party. Board of Education v. Pico, 457 U.S. 853, 863 (1982). Nonetheless, a party opposing a motion for summary judgment may not simply allege that there are disputed issues of fact; rather, the party "must set forth *specific* facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e) (emphasis added). *See also*, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (citations omitted). In addition, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

The undisputed facts establish that plaintiff is a Caucasian male with brown skin who was born and raised in Pakistan. Plaintiff was born in 1942 and is a practicing Muslim. He began working for Boeing in January 1980 and transferred to the B1-B Program at Tinker Air Force Base in Midwest City, Oklahoma in July 1993. At Tinker, Boeing works under contracts with the government to upgrade the

avionics software for the B1-B bomber.  Plaintiff was employed as an Engineer/Scientist 4 or Software Test Engineer and was assigned to the Software Test group.  As a Software Test Engineer, plaintiff was responsible for writing test procedures for the software upgrades and verifying the test procedures against software in the B-1B simulation lab.

From July 1993 to August 1995, plaintiff was supervised by Dan Naugle.  After Naugle was promoted, plaintiff's direct supervisor was Steve Maxwell until Maxwell was promoted in June 2002.  At that time, Kerri Collison became acting manager of the Software Test group and thus plaintiff's immediate supervisor.  Collison was formally promoted to the manager position effective December 27, 2002.  Her immediate supervisor was Maxwell.

In December 2002, the government directed Boeing to stop work on the contract involving an upgrade of the B1-B defense system.  Boeing negotiated with the government to institute an orderly shutdown, which would have allowed work to continue for a period of time and would have avoided layoffs.  The government however formally announced cancellation of the contract on January 14, 2003.  On January 22, 2003, Naugle forwarded a packet of materials to managers with instructions to conduct a retention exercise in case Boeing needed to implement a RIF at Tinker.  For purposes of the exercise, the 27 engineers in Test Engineering – consisting of employees in the Software Test, Lab Operations, and Flight Test

groups – were to be evaluated as one group. The managers[1] over the three subgroups were asked to individually rate the employees who reported to them according to the rating criteria Naugle had received from his superiors in Long Beach, California. Employees were rated on a 100-point scale based on the following criteria: (1) ability to perform remaining work (worth up to 75 points); (2) length of Boeing service (worth up to 15 points); and (3) education, training, and recognition (worth up to 10 points). Exhibit 3A to Defendant's Motion for Summary Judgment at 4 [hereinafter cited as "Defendant's Motion"]. The ability to perform remaining work category was further subdivided into: (a) work quality and quantity; (b) job knowledge and experience; (c) versatility of skills; (d) aptitude, judgment, and demonstrated efficiencies; (e) customer satisfaction; and (f) communication skills. Id. For length of service, an employee was given one point for every two years of Boeing employment. With respect to the third category, employees could garner up to eight points for professional degrees or skill training and an additional two points for special awards or customer recognition. Id. Employees with technical degrees were assigned two points for an associates degree, four points for a bachelor's degree, six points for a master's degree, and eight points for a doctoral degree. Employees were assigned one point if they had received internal recognition or

---

[1] Collison was the Software Test manager, while Lab Operations were overseen by Scott Campbell and the Flight Test group was managed by Jeff Mager. Thirteen employees comprised the Software Test group; Lab Operations had ten employees and the Flight Test group consisted of four employees.

appreciation awards and an additional point if they had received a significant award such as a Silver Eagle award or the Amelia Earhart award.

After the three managers individually rated their employees, they met with Maxwell to rank the employees of the Test Engineering group. On the retention exercise, Collison had given plaintiff a total score of 35 points out of the 100 points possible.[2] Exhibit 4 to Defendant's Motion at ¶ 15. As a result, he was ranked 27th out of the 27 employees in the Test Engineering group. Exhibit 25 to Defendant's Motion at 1. At the time the managers met to rank the employees, they did not know whether a RIF would be required and, if so, which groups would be affected or how many employees from each group would be laid off. In early February 2003, however, Boeing's senior management learned that the government had rejected Boeing's proposal for an orderly shutdown; as a result, Boeing instituted the RIF at Tinker. A total of eight employees including plaintiff were issued 60-day layoff notices; two of those employees, however, managed to find jobs at other Boeing locations during the 60-day notice period and therefore were not terminated. Plaintiff and four other employees were laid off effective April 17, 2003; the sixth employee was laid off effective July 25, 2003 after he returned from a medical leave of absence. Plaintiff was 61 years old at the time.

---

[2] While plaintiff disputes whether he should have received this score, he does not dispute that he was so rated and that as a result of this rating he was ranked last.

Plaintiff's Termination Claims

Discrimination

As plaintiff presents no direct evidence of discrimination, his national origin, race, color, religion, and age discrimination claims are analyzed using the burden-shifting framework first articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973).  Stone v. Autoliv ASP, Inc., 210 F.3d 1132, 1137 (10th Cir.), *cert. denied*, 121 S. Ct. 182 (2000).

> To make out a prima facie case of discriminatory discharge . . . a claimant affected by a RIF must prove: (1) that she is within the protected age group; (2) that she was doing satisfactory work; (3) that she was discharged despite the adequacy of her work; and (4) that there is some evidence the employer intended to discriminate against her in reaching its RIF decision.  The fourth element may be established "through circumstantial evidence that the plaintiff was treated less favorably than younger employees during the [RIF]."

Beaird v. Seagate Technology, Inc., 145 F.3d 1159, 1165 (10th Cir.), *cert. denied*, 119 S. Ct. 617 (1998) (citations omitted).

The court finds that plaintiff cannot establish a prima facie case of race discrimination.  In the Charge of Discrimination filed with the Oklahoma Human Rights Commission, plaintiff indicates his race is "Caucasian".  Exhibit 29 to Defendant's Motion.  Likewise, plaintiff's complaint and amended complaint refer to him as being a member of the Caucasian race.  Complaint at ¶ 12; First Amended Complaint at ¶ 12.  As plaintiff belongs to the majority race, his claim of race

discrimination must be analyzed under the standards adopted by the Court of Appeals for the Tenth Circuit in Notari v. Denver Water Dep't, 971 F.2d 585 (10th Cir. 1992). To establish a claim of reverse race discrimination, plaintiff must establish "background circumstances that support an inference that the defendant is one of those unusual employers who discriminates against the majority." Id. at 589. In the alternative, plaintiff can meet the first prong of the prima facie case by presenting evidence "that but for the plaintiff's status the challenged employment decision would have favored the plaintiff." Id. at 590. Plaintiff, however, has not attempted to make either showing.

For purposes of ruling on defendant's motion for summary judgment, the court assumes that plaintiff can establish a prima facie case with respect to his age, color, national origin, and religion claims. Therefore, the burden shifts to defendant to articulate a legitimate non-discriminatory reason for its decision to terminate plaintiff. Id. "The plaintiff may then resist summary judgment if [he] can present evidence that the proffered reason was pretextual, 'i.e. unworthy of belief,' *see Randle v. City of Aurora*, 69 F.3d 441, 451 (10th Cir. 1995), or otherwise introduces evidence of illegal discriminatory motive, *see id.* at 453." Beaird, 145 F.3d at 1165. In a RIF case, pretext is normally established by showing either (1) that plaintiff's termination does not accord with the RIF criteria, (2) that plaintiff's evaluation under the RIF criteria was deliberately falsified or manipulated, or (3) that the RIF was generally pretextual

in that defendant replaced discharged employees with new hires.  See id. at 1167-68.

Boeing contends that it terminated plaintiff because he was the lowest ranked employee in his work group and the low ranking was due to his history of poor performance in relation to his peers.  Plaintiff's performance problems surfaced as early as 1994.  In mid-1994, Naugle removed plaintiff from a project at the government's request because of plaintiff's inadequate performance. Deposition of M. Shafi Chaudry at 63; Affidavit of Daniel Naugle at ¶ 4.  On plaintiff's 1998 evaluation, Maxwell noted that plaintiff needed to work on communicating with members of his team and management and should "complete more procedures".  Exhibit 8 to Defendant's Motion.  In July 1999, a peer review of plaintiff's work on the Block E TPM Procedure was conducted.  The peer review session was attended by plaintiff, two of his coworkers – Roger Hall and Jeff Henderson – and Maxwell.  In an e-mail memorializing the session, Hall noted that plaintiff "met our comments with resistance, and our presence in the Peer Review with contempt."  Exhibit 2-C to Defendant's Motion at 1.  Hall made a number of observations, including

> [a]s we were leaving the meeting, I mentioned to Shafi to remember to use the spell-check tool because I had noted a large number of misspellings throughout the document. Shafi stated that Shannon would catch his mistakes.  I expressed my opinion that Shannon was not our secretary and that he should write his procedures using standard, required formatting (just like everyone else).  I told him that I thought Shannon did not have the time to rewrite our documentation.  Shafi become personal at that time and

> stated that he was too busy to run the spell-check and that maybe "You should do it." Meaning, I suppose, that I have enough time to do his job.
>
> * * *
>
> [Plaintiff's] attitude was disrespectful (especially to Steve), and totally without merit. . . . [B]ecause Shafi's attitude was completely unprofessional, I feel the time spent reviewing his procedure and attending the Peer Review has been wasted, and that another Peer Review is necessary to ensure all the appropriate changes have been incorporated.

Exhibit 2-C to Defendant's Motion at 2. Plaintiff's failure to communicate was again noted on his 2000 performance appraisal. His performance was rated as below expectations in four categories: Effectively utilizing resources to complete assignments on time; readily accepting and completing unplanned activities; working cooperatively with team members to accomplish tasks; and sharing knowledge and participating in decision making. Exhibit 10 to Defendant's Motion. In March 2001, plaintiff was placed on an informal improvement plan, which noted "[y]our reluctance to share information with your peers, Lead Engineer, and Manager hinders the overall ability of the group to monitor and track progress." Exhibit 14 to Defendant's Motion. One month later, Maxwell wrote a memorandum to plaintiff in which he reminded him that a key aspect of the informal improvement plan "is your communication with your lead engineer. I was disappointed by your unwillingness to coordinate your activities with your lead engineer, Ms. Collison." Exhibit 2-E to Defendant's Motion. On May 29, 2002, Maxwell notified Naugle that plaintiff was still

not working with Collison.  Exhibit 2-H to Defendant's Motion.  Maxwell reported that during a meeting, "Shafi declared that he wasn't responsible to Kerri [Collison] as his lead." Id.  Maxwell concluded, "We cannot have one individual that refuses to work with the lead and doesn't carry his load.  I don't have time to baby sit him or play go-between for Kerri.  She has that responsibility and everybody has to work within that structure.  (All the other test engineers seem to be able to work that way, but not Shafi.)" Id.  In October 2002, Collison counseled plaintiff regarding his participation in peer reviews.  In her report to Maxwell regarding her counseling session with plaintiff, Collison noted:

> Shafi still isn't doing any real work.  A new employee has taken over the future TPMs that Shafi was doing.  They were supposed to be working them as a team, but Shafi never contributed so the new employee has pressed on.  Due to this, I assigned Shafi the C&D Test Procedures for E-1 and JJI.  This has not been well received on the systems side of the house, but they are trying to work with him.  Shafi's blatant non-support of doing the peer review was obvious to everyone invited to the peer review because notification had to be sent out canceling the meeting.  His non-support will also cause another slide in the systems TC development schedule.  I will be monitoring this until it gets resolved.  I plan on reviewing the work he claims to have done as soon as it arrives.  I will follow up with an email then.  My biggest concern is that we are going to spend all of this time & money trying to get Shafi to do the work and some one else is going to have to come in and re-do it all.

Exhibit 4-C to Defendant's Motion at 3.  One month later, Collison discussed with Maxwell and Boeing's human resources department her intention to place plaintiff

on a formal improvement plan. Affidavit of Kerri Collison at ¶ 6. The Formal Improvement Action Plan, which was implemented on January 13, 2003, provided that:

> Shafi, it is critical to the success of our project that you complete assigned tasks efficiently/expeditiously and that you shoulder your responsibility for SW Test's contribution to the B-1B Program. Your continual reluctance and lack of sharing information with your peers, Lead Engineer, and Manager hinders the overall ability of the group to monitor and track progress. Therefore, you must exercise better time management of your tasks and also provide feedback to your Lead and your Manager when events delay your progress toward completion on any of these tasks.

Exhibit 19 to Defendant's Motion at 1. On January 17, 2003, Collison received a complaint from Shannon Hawthorne regarding plaintiff. Exhibit 4-D to Defendant's Motion. Hawthorne complained that she had to do plaintiff's work for him. She concluded by noting:

> This has happened numerous times in the past. It's always something that everyone else knows how to do, a standard practice, that he doesn't know how to do when he should. In addition, it is my belief that he pretends to not understand so that I will do the job for him. It is very frustrating. If I don't do it now, I'll have to fix it later. Or if I don't do it, it takes me three to four times longer than me just doing it and I don't normally have that much free time. . . . In addition, by having to do some of his work, it takes up my time as well just not as much as teaching him. If I thought that he was trying to learn and not just "acting" slow, I'd be more than happy to show him.

Id. at 1-2.

Collison knew about plaintiff's performance problems when she completed his individual assessment worksheet during the retention exercise. She assigned plaintiff five points for work quality and quantity based on her observations that plaintiff did not work as effectively or as efficiently as other engineers in her work group. Affidavit of Kerri Collison at ¶ 15. Collison allotted three points on the knowledge/experience criterion based on complaints that plaintiff relied on peers to complete his work. He received four points for versatility of skills based on Collison's conclusion that plaintiff did not demonstrate efficient skills in any of the functional areas that he had been assigned. Plaintiff was given five points for aptitude and judgment because Collison knew of instances when plaintiff's work had to be reassigned or redone because of errors. He received only one point each for customer satisfaction and communication skills because of peer complaints and his failure to communicate with Collison. Id. This resulted in a score of 19 out of 75 on the first criterion on the individual assessment worksheet. This score was the driving force behind plaintiff's last-place ranking during the retention exercise because his scores on the other two criteria were in line with or higher than other employees. *See* Exhibit 25 to Defendant's Motion at 1. Boeing relied on plaintiff's low ranking when it decided to terminate him during the RIF.

Defendant has thus met its burden of articulating a legitimate, non-discriminatory reason for its decision to terminate plaintiff. Plaintiff attempts to rebut defendant's justification by claiming that he "was qualified to perform his job duties

as a test engineer and did so in a satisfactory manner." Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment at 3. In support of this claim, plaintiff cites his affidavit, his resume, various certificates he received while employed by Boeing, and selective evaluations. "However, an employee's 'own opinions about his . . . qualifications [do not] give rise to a material factual dispute." Simms v. Oklahoma, 165 F.3d 1321, 1329 (10th Cir.), *cert. denied*, 528 U.S. 815 (1999) (*quoting* Rabinovitz v. Pena, 89 F.3d 482, 487 (7th Cir. 1996)). In addition, plaintiff makes no attempt to demonstrate pretext under the standards enunciated in Beaird. In fact, plaintiff does not dispute that the RIF was necessary, and there is no evidence that plaintiff was replaced by any employee, much less by a new hire. Nor does plaintiff claim pretext on the ground that his termination was not in accord with Boeing's RIF criteria; he concedes that he was ranked last in the Test Engineering group. Furthermore, there is no evidence that his evaluation under the RIF criteria was manipulated or falsified; considerable support for plaintiff's rating by Collison exists. Rather, plaintiff attempts to demonstrate pretext by claiming that Boeing deviated from its prior RIF system and that under the prior system he would have been protected from layoff. A company's altering the rules for conducting a RIF, however, constitutes an exercise of its business judgment and will not be disturbed by this court. *See* Beaird, 145 F.3d at 1169; Ingels v. Thiokol Corp., 42 F.3d 616, 623 (10th Cir. 1994). There is no evidence that the decision to use a different system for conducting the retention exercise was tainted by discriminatory

motive; rather the new system was mandated by Naugle's superiors in Long Beach. Boeing's RIF decision was within its prerogative and plaintiff has failed demonstrate pretext. Defendant is thus entitled to summary judgment on plaintiff's discrimination claims with respect to his termination.

### Retaliation

Plaintiff also contends that he was terminated in retaliation for protected activity. To establish a prima facie case of retaliation, plaintiff must show that:

> (1) he engaged or participated in a prior protected [activity]; (2) he was later disadvantaged by action of his employer subsequent to or contemporaneously with such participation; and (3) there is a causal connection between the protected activity and the adverse employment action.

Chavez v. City of Arvada, 88 F.3d 861, 865-66 (10th Cir. 1996), *cert. denied*, 519 U.S. 1056 (1997). "The causal connection may be demonstrated by evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action." Burrus v. United Telephone Co. of Kansas, Inc., 683 F.2d 339, 343 (10th Cir.), *cert. denied*, 459 U.S. 1071 (1982). If plaintiff establishes his prima facie case, the burden of production shifts to defendant to show a legitimate, non-retaliatory reason for the employment decision. EEOC v. Flasher Co., Inc., 986 F.2d 1312, 1316 (10th Cir. 1992). If defendant meets its burden of production, the burden then shifts to plaintiff who must show that defendant's proffered reason was merely pretext for retaliation. Plaintiff can establish pretext by demonstrating that either that a retaliatory motive more likely

motivated defendant or that defendant's proffered reason is unworthy of credence. Plaintiff can also carry his burden by producing direct evidence of retaliation. See Jones v. Unisys Corp., 54 F.3d 624, 630 (10th Cir. 1995).

The undisputed facts establish that in May 1998, plaintiff contacted Boeing's Equal Opportunity Programs office to complain about discriminatory salary increases. He alleged that he was being discriminated against on the basis of age. Four years later, in October 2002, plaintiff filed a second complaint. In this charge, plaintiff again complained that he was not receiving salary increases commensurate with his abilities and seniority. Exhibit 21-B at 1. He also obliquely complained of race discrimination with respect to promotional opportunities. Id. at 2. In the main, however, plaintiff's 2002 complaint leveled charges of unethical behavior and favoritism by Maxwell.[3]

The court finds that plaintiff cannot establish the causation element of the prima facie case. The 1998 complaint is too remote in time to his April 2003 termination to permit an inference of causation. Although the 2002 complaint is closer in time to plaintiff's termination, it also "meaningless unless those who caused the alleged retaliatory act to occur are shown to have been aware of the specific activity." Hysten v. Burlington Northern & Santa Fe Ry. Co., 296 F.3d 1177, 1184 (10th Cir. 2002). As Collison is the one whose rating led to plaintiff's termination, it

---

[3]See id. at 1 ("He would put his favorable people in a lead position without any announcement . . . . He is still practicing the favoritism."). Id. at 2 ("Maxwell . . . leans toward cronyism. . . . They are selecting their buddies . . . .").

is her knowledge of plaintiff's protected activity that is key. It is, however, undisputed that she had no knowledge of plaintiff's 2002 complaint. Deposition of Kerri Collison at 33, 40, 85-86. Furthermore, even if plaintiff could establish a prima facie case of retaliation, he could not prevail. As noted above, Boeing has sustained its burden of setting forth a non-retaliatory reason for plaintiff's discharge and plaintiff cannot demonstrate pretext.

Plaintiff's Failure to Promote and Disparate Pay Claims

The court finds these claims also fail as a matter of law. Plaintiff was not eligible for promotion to any management position at Boeing until he passed the Pre-Management Assessment Process. Plaintiff completed this program in May 2002. From that time until his termination, plaintiff applied for 12 promotions. Plaintiff concedes that all of the management positions he applied for required management experience and that he did not have such experience. As plaintiff was not qualified for the management positions, he cannot establish a prima facie case of discrimination. Likewise, he cannot establish that his salary increases were the result of discrimination. Plaintiff admits that pay at Boeing is determined by performance. The litany of performance problems noted above is more than sufficient justification for the disparity in pay increases between plaintiff and other employees.

In sum, Defendant's Motion for Summary Judgment (Doc. No. 41) is GRANTED. Judgment will issue accordingly.

It is so ordered this 15th day of August, 2005.

*/s/ Tim Leonard*
TIM LEONARD
United States District Judge